# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

GALESBURG 67, LLC ET AL,

      Plaintiffs,

      v.

NORTHWEST TELEVISION, INC.
ET AL,

      Defendants.

No. 15 C 5650

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

In 2000, Plaintiffs Galesburg 67, LLC ("G67") and DM Partners ("DM") each entered into a "Settlement Agreement" with Defendant Northwest Television, Inc. ("Northwest") (collectively, the "Agreements"). Defendant Bruce Fox ("Fox") was the President of Northwest. In the Agreements, G67 and DM each agreed to withdraw their applications for a license from the Federal Communications Commission (FCC) for a new television station in Galesburg, Illinois, so that Northwest could be the prevailing applicant. In return, Northwest agreed to pay G67 and DM. On September 14, 2012, the FCC issued the broadcast license to Northwest. However, Northwest never paid G67 or DM.

Plaintiffs brought this lawsuit alleging breach of contract against Northwest, fraudulent transfer against Northwest and Fox, and unjust enrichment against Northwest (in the alternative) and Fox. The Court held a one-day bench trial on February 28, 2017. The Court enters findings of fact and conclusions of law

pursuant to Fed. R. Civ. P. 52(a) as set forth below and enters judgment in favor of Plaintiffs and against Defendants on Plaintiffs' unjust enrichment claim.

## I. JURISDICTION AND APPLICABLE LAW

The parties consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c). (Dkt. 89). This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332. (*see* Dkt. 31). Illinois law applies. *See FDIC v. Wabick*, 335 F.3d 620, 625 (7th Cir. 2003) ("it is well established that in diversity cases state law is the appropriate source for choice-of-law rules.").[1]

## II. PRIOR PROCEEDINGS

Plaintiffs filed their original complaint on June 25, 2015. On November 3, 2015, Judge Guzman granted in part and denied in part Defendant Fox's Joint Motion to Dismiss the complaint. On November 17, 2015, Plaintiffs filed their First Amended Complaint ("FAC"). (Dkt. 33). Defendants' second motion to dismiss was denied. (Dkt. 73). On February 13, 2017, Defendants filed instanter their Answer and Affirmative Defense to the FAC. (Dkt. 111).

## III. THE TRIAL

The main issues at trial were whether: (1) the parties had an oral agreement modifying the written Agreements pursuant to which Northwest agreed to pay Plaintiffs in cash upon the issuance of the license; (2) the change from Channel 53

---

[1] *See* Dkt. 32 at 4, n. 3 (J. Guzman) (noting that both contracts in this case contain an Illinois choice of law clause and neither party had raised any choice of law concerns).

to Channel 8 was a "material adverse change" that meant that Northwest was not obligated to pay Plaintiffs; (3) Defendants' transfer of funds in 2012 was a fraudulent conveyance; and (4) Defendants were unjustly enriched at Plaintiffs' expense. Three witnesses testified at trial: Bruce Fox, John Warren ("Warren"), the sole member of G67, and Donald Bae ("Bae"), one of the partners of DM. After trial, each party submitted post-trial proposed findings of fact and conclusions of law. (Dkt. 119 (Plaintiffs) and Dkt. 120 (Defendants)).[2]

## IV. FINDINGS OF FACT

Northwest, DM, and G67 were all mutually exclusive applicants for a new television station in Galesburg, Illinois. (JX 1 and JX 2). To better Northwest's chances of having a license granted, G67 and DM agreed to request that the FCC dismiss their applications in exchange for payment from Northwest—$600,000.00 for G76 and $450,000 for DM. (*Id*.). Northwest and DM memorialized their agreement in a contract dated June 29, 2000, amended, in writing, on July 17, 2000 (the "DM Agreement"), and Northwest and G67 memorialized their agreement in a contract dated July 17, 2000 (the "G67 Agreement"). (*Id*.; Dkt. 119, ¶¶2-4; Dkt. 120, ¶¶1-3). Both Agreements required all amendments to be in writing. (JX 1, ¶12 and JX 2, ¶12). The parties did not document in writing any oral agreement that Plaintiffs alleged occurred in January 2001. (Dkt. 120, ¶16).

The Agreements required Plaintiffs and Northwest to prepare and file a "Joint Request for Approval of Universal Settlement" (the "Joint Request"),

---

[2] The Court directed the parties to cite to the transcript as well as pertinent case law. (Dkt. 117). Plaintiffs cited very little case law, and Defendants did not cite any case law.

pursuant to the FCC rules. (JX 1, ¶1 and JX 2, ¶1). The Agreements provided that within ten business days of the filing of the Joint Request, Northwest would place in escrow irrevocable letters of credit to be disbursed as described in the Escrow Agreements, attached as Exhibit A to the Agreements. (JX 1, ¶6, JX 2, ¶6, PX 7 and PX 8). Northwest's plan was to assign its interest in the television station to non-party Second Generation of Iowa, Ltd. ("Second Generation"), and in exchange, Second Generation would fund the payments to Plaintiffs and non-party Highland Broadcasting ("Highland"), the withdrawing applicants under the universal settlement. (Tr. at 10-11; PX 5). The "Loan and Option Agreement" between Northwest and Second Generation anticipated that Second Generation would loan Northwest $1,475,000 to fund the payments to DM, G67, and Highland. (PX 5).

Northwest, Plaintiffs, and Highland filed the Joint Request, but the process was delayed because Quad Cities Television Acquisition Corp. ("Quad Cities") filed a petition to deny Northwest's application with the FCC. (Dkt. 119, ¶9). On July 20, 2007, the FCC granted in part and denied in part Quad Cities' petition. (PX 5, hereafter the "FCC 2007 Ruling"). The FCC granted the Joint Request (although without the Loan and Option Agreement) and Northwest's application for the station on Channel 53, and dismissed the applications of DM, G67, and Highland. (Tr. at 48, 52; PX 5). The FCC later repurposed Channel 53, however, granting Northwest Channel 8 instead. (Tr. at 63).

On September 14, 2012, the FCC issued the broadcast license for Channel 8 to Northwest. (PX 1). On October 15, 2012, Northwest sold the license to Trinity

Christian Center of Santa Ana, Inc. ("Trinity") for $1,125,000 (hereafter "Trinity-Northwest Agreement"). (*Id.*; *see also* PX 2). Trinity paid Northwest $1,125,000, $825,000 of which was used to cancel a loan Northwest owed Trinity. (*Id.*; Tr. at 37). Trinity paid Northwest the remaining $300,000 via wire transfer. (*Id.*; Tr. at 38). Northwest then distributed $100,000 to Fox, the President of Northwest, and $100,000 to the two other partners and shareholders of Northwest, Dale Arfman and Tom Gilligan. (Tr. at 4, 38). The remaining money was used to pay past legal bills and broker fees. (Tr. at 37-38; Dkt. 120, ¶¶20-21). After distributing the money, Northwest had about $1,000 in the bank and no other assets. (Tr. at 42-43). Northwest never paid DM or G67. (Dkt. 119 ¶¶31-32; Dkt. 120, ¶29).

## V. CONCLUSIONS OF LAW

### A. Breach of Contract against Northwest

It is undisputed that Northwest entered into the Agreements with DM and G67, that the FCC issued the broadcast license to Northwest in September 2012, and that Northwest never paid DM or G67. The parties dispute what happened after they entered into the Agreements, however. Plaintiffs claim that approximately six months after the Agreements were executed and shortly before the letters of credit were to expire, Fox, Bae, Warren, and a representative of Highland had a phone conversation during which Fox promised to pay cash to Plaintiffs and Highland when the FCC issued the broadcast license to Northwest. Defendants deny entering into any such oral agreement. Instead, Defendants claim that "material adverse changes" occurred and the original transaction contemplated

by the Agreements was never realized, meaning Northwest was not obligated to pay Plaintiffs.

### 1. Defendants' Statute of Limitations Defense

The Court initially addresses Defendants' statute of limitations defense to Plaintiffs' breach of contract claim, raised for the first time in Defendants' post-trial brief. (Dkt. 120 at 8). This defense is waived for two reasons: (1) failure to plead an affirmative defense results in forfeiture of that defense if the plaintiff would be harmed and (2) the defense was raised after trial.

Defendants' answer and affirmative defense to the FAC (Dkt. 111) did not include a statute of limitations defense. The Federal Rules require a party to affirmatively state any affirmative defense, including statute of limitations. Fed. R. Civ. P. 8(c)(1). The Seventh Circuit Court of Appeals has held that "[t]he failure to plead an affirmative defense in the answer works a forfeiture only if the plaintiff is harmed by the defendant's delay in asserting it." *Carter v. United States*, 333 F.3d 791, 796 (7th Cir. 2003). Here, Plaintiffs certainly would be harmed since they had no opportunity during the litigation or at trial to address this defense. *See Dexia Crédit Local v. Rogan*, 629 F.3d 612, 627 (7th Cir. 2010) ("[Defendants'] failure to raise the specific statute of limitations defense has limited [plaintiff's] ability to fully develop the arguments against [its] application [and defendants] have not presented any excuse for waiting until after the trial to raise the five-year statute of limitations as an affirmative defense.").

Defendants' statute of limitations defense is waived for a second reason: they raised the defense after trial and did not include it in the pre-trial order (Dkt. 109). A trial court may exclude claims, theories, or evidence not raised in a pretrial order. *Gorlikowski v. Tolbert*, 52 F.3d 1439, 1444, n.3 (7th Cir. 1995). Defendants themselves stated in both their pre-trial and post-trial briefs that they had a single affirmative defense (that the transactions "memorialized by the two contracts were never consummated"). (Dkt. 109 at 12).

### 2. Letters of Credit

The Court also addresses Plaintiffs' argument that the letters of credit were not "irrevocable" because they expired January 22, 2001. (Dkt. 119, ¶18). At trial, Plaintiffs' counsel asked a number of questions about the fact that the letters of credit issued for the benefit of Plaintiffs stated that they were "irrevocable" and also contained an expiration date of January 22, 2001. (*see* Tr. at 16, 78; *see also* PX 6). Plaintiffs do not cite any authority for the proposition that a letter of credit containing an expiration date is not irrevocable. To the contrary, in Illinois, a letter of credit is revocable "only if it so provides." 810 ILCS 5/5-106. *See also Old Republic Sur. Co. v. Quad City Bank & Tr. Co.*, 681 F. Supp. 2d 970, 971 (C.D. Ill. 2009) (irrevocable letter of credit contained expiration date).[3]

The Court finds that the testimony on this issue was relevant only to Plaintiffs' explanation for why the parties allegedly had a telephone conversation in

---

[3] "[A] revocable credit . . . may be modified or revoked by the issuer without notice to or consent from the customer or the beneficiary…[a]n irrevocable credit, on the other hand, is a definite undertaking on the part of an issuing bank and constitutes the engagement of that bank to the beneficiary…" *Beathard v. Chi. Football Club, Inc.*, 419 F. Supp. 1133, 1136 (N.D. Ill. 1976) (internal citations and quotations omitted).

January 2001 as the expiration date of the letters of credit approached. But as explained below, the Court concludes that Plaintiffs did not prove that the Agreements were orally modified.

### 3. Oral Modification

The Court concludes that Plaintiffs failed to prove that the Agreements were orally modified via the telephonic conversation among the parties in January 2001. Because Plaintiffs failed to prove the existence of a binding and enforceable contract, Northwest is entitled to judgment on the breach of contract claim.

Under Illinois law, a modified contract "is regarded as creating a new single contract" containing the terms of the original contract that have not been changed and the new agreed-upon terms. *Schwinder v. Austin Bank*, 348 Ill. App. 3d 461, 469, 284 Ill. Dec. 58, 67 (2004). When, as here, a contract is modified or amended by a subsequent agreement, "any lawsuit to enforce the [agreement] must be brought on the modified agreement and not on the original agreement." *Id.*; *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 757 (7th Cir. 2012). Plaintiffs' claim is that that Northwest breached the orally-modified Agreements. (Am. Compl. (Dkt. 33), ¶10; Dkt. 109, p. 10; Dkt. 119, p. 5, 9-10).[4]

Plaintiffs had the burden to prove that the Agreements were orally modified by clear and convincing evidence. *Do It Best Corp. v. Passport Software*, Inc., No. 01 C 7674, 2005 U.S. Dist. LEXIS 7213, at *28 (N.D. Ill. Mar. 31, 2005); *Czapla v. Commerz Futures, LLC*, 114 F. Supp. 2d 715, 718 (N.D. Ill. 2000). At trial, Warren

---

[4] *See* Dkt. 73 at 6, Order Denying Second Motion to Dismiss (construing Plaintiffs' Amended Complaint as alleging that the Agreements were orally modified to require Northwest to pay Plaintiffs upon the issuance of the broadcast license.)

testified about a phone conversation that modified the Agreements. (Tr. at 79). Bae testified that his recollection of the phone conversation was consistent with Warren's, and adopted Warren's testimony about the oral modification. (Tr. at 127, 142). Both Warren and Bae testified that had the parties not agreed to the modification, they would have gone forward with their applications for the license instead of withdrawing them, as they had previously agreed. (Tr. at 81, 127).

Warren provided very few details in his testimony about the phone call. He could not identify a date or even an estimated date of the phone call. He also admitted that he forgot who initiated the call and "guess[ed]" that four parties were on the phone. He testified:

> It was a phone call. I forget who initiated it, but there was a phone call where the -- I guess the four parties were on the phone. And we discussed the possibility of – of Second Generation not -- not performing on these -- on these notes, that the notes would expired. And that it was Highlands' responsibility -- and that Northwest -- it was their responsibility to perform.
>
> And it was discussed on the phone that Northwest would continue with the obligation under the contract in a cash payment, so we could go forward. Donald [Bae] even had mentioned at -- during part of the conversation, do we need to cancel the settlement, and -- and asked FCC to reinstate our applications.
> (Tr. at 79).

Warren's and Bae's limited testimony explaining why they were comfortable with only an oral agreement, without any written confirmation, was not believable. Warren testified that he "trusted" Fox, someone he with whom he was not friends but with whom he had an "occasional business call." He also said he believed "we still had the agreement in effect." (Tr. at 81-82, 111). Bae testified that he was

comfortable with just an oral agreement because he "felt that it was just confirming the original agreement." (Tr. at 133, 143). These explanations were confusing and also contradicted Warren's and Bae's testimony about the importance of the oral agreement. It is significant to the Court that both were adamant that without the oral agreement, they would have reinstated their applications with the FCC. (Tr. at 81, 127, 133). Neither Warren nor Bae offered any testimony about whether there was any discussion during the telephone call or at any other time about the provision in the Agreements requiring amendments to be in writing.

Understandably, memories fade since the alleged phone conversation in 2001. Still, the Court was not convinced by Warren's and Bae's testimony because of the lack of detail provided and confusing and contradictory testimony. In addition, the Court did not find Warren to be particular credible, especially during his discussion about the alleged oral agreement. His tone of voice and body language did not project confidence in his answers to questions during trial. Warren was particularly difficult to understand during his testimony about the alleged oral agreement, mumbling and speaking very quickly. *See* Tr. at 80 (Plaintiffs' attorney told Warren that "your prior answer [] might have come out garbled.").

On the other hand, Fox testified that he never would have made an oral agreement for a modification as important as the one claimed by Plaintiffs. (Tr. at 151-52).[5] The Court found Fox's demeanor credible and confident. When asked

---

[5] When Fox was asked whether he recalled having a conversation with John Warren and Donald Bae, he responded that he did "not recall those conversations." (Tr. at 28).

about the alleged oral modification of the Agreements, Fox stressed that there was no oral modification:

> "There were no oral modifications at any time." (Tr. at 58-59).

> "There is no way in 35 years in business that I would have ever agreed to anything as important as this orally. I don't even recall the conversation. But I'm going to say if we had had a conversation, there is no way I would have done anything orally. Everything was in writing. All amendments were in writing. Every contract I ever did was in writing." (*Id.* at 151-52).

The trial testimony showed that Fox, Warren, and Bae were all sophisticated businessmen. All three testified about how consequential this modification would be. The Court concludes that Fox's version of events—that the alleged oral modification did not happen—is far more credible. This is supported by that fact that not long after the DM Agreement was executed, and only about 5 months before the oral modification alleged here, Northwest and DM executed a written amendment to their Agreement. This uncontested fact further undermines Bae's testimony that he and Fox and Warren entered into an oral modification.

Finally, Plaintiffs had to prove, by clear and convincing evidence, that the parties waived the provision in the Agreements requiring amendments to be in writing. The provision stated:

> "This Agreement shall not be altered or amended except in writing signed by the party against which enforcement is sought." (JX 1, ¶12, JX 2, ¶12).

Plaintiffs did not offer *any* evidence showing that the parties agreed to waive this provision in the Agreements. *See Czapla*, 114 F. Supp. 2d at 718 ("In Illinois, oral contract modifications are permissible even if the contract contains a provision

banning oral modifications…This is because such a provision may be waived…A claimant must, however, prove waiver of the provision by clear and convincing evidence."); *Beloit Corp. v. C3 Datatec*, Case No. 93-C-447, 1995 U.S. Dist. LEXIS 16685, at *31 (E.D. Wis. Aug. 23, 1995) ("To prevail, C3 must establish that the parties by their words or conduct evidenced an intent to waive or modify this provision [requiring changes to the contract to be in writing].") (citing *Allen & O'Hara, Inc. v. Barrett Wrecking, Inc.*, 898 F.2d 512, 517 (7th Cir. 1990)).

Plaintiffs point to the FCC 2007 Ruling as "consistent with the oral modification" and showing a "clear expectation" that Northwest would pay the withdrawing applicants. (Dkt. 119, Pl.'s Facts ¶25; Pl.'s Concl. ¶2). The FCC 2007 Ruling may show that Northwest represented to the FCC that it was able to fund the universal settlement even without the loan from Second Generation. But that is not clear and convincing evidence that nearly seven years earlier, the parties had a telephone conversation during which they orally modified the Agreements and agreed to waive the provision requiring amendments to be in writing.

Because Plaintiffs claimed a breach of the modified Agreements but failed to prove the existence of the modified Agreements, they are not entitled to judgment for breach of contract against Defendant Northwest.

## B. Unjust Enrichment against Northwest and Fox

Plaintiffs proved by a preponderance of the evidence that Defendants were unjustly enriched at Plaintiffs' expense. Unjust enrichment requires that (1) defendants unjustly retained a benefit, (2) to the plaintiffs' detriment, and (3)

defendants' retention of the benefit violates the fundamental principles of justice, equity, and good conscience. *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 832 (7th Cir. 2016); *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 160, 137 Ill. Dec. 19, 26 (1989); *Ramirez v. T&H Lemont, Inc.*, No. 16-1753, 2016 U.S. App. LEXIS 23404, at *9 (7th Cir. Dec. 30, 2016) ("…the presumption that the burden of proof in federal civil cases is proof by a preponderance of the evidence…") (internal citations and quotations omitted).

At trial, Fox admitted that Plaintiffs gave up something of monetary value (their applications for the license with the FCC) for the benefit of Northwest, and the parties valued that benefit in the amount of $600,000 and $450,000. (Tr. at 45-46). Fox admitted that Plaintiffs conveyed that benefit to Northwest by dismissing their applications and that Northwest enjoyed the benefit of those dismissals when the FCC issued the license to it. (*Id.*). Fox also admitted that Plaintiffs were never compensated for that benefit conveyed to Northwest. (*Id.*). It is undisputed Northwest never paid DM or G67. Fox also testified that without Plaintiffs' withdrawal of their applications, Northwest never would have enjoyed the consideration paid by Trinity. (Tr. at 46). The amount Trinity paid was $1,125,000 for the broadcast license and other station assets. (PX 1).

Defendants' retention of the benefit conveyed by Plaintiffs violates the fundamental principles of justice, equity, and good conscience. At trial, Fox testified that he received $100,000 individually. (Tr. at 38). He also said that the final "proceeds" to Northwest was $300,000, and part of the money went to pay off a loan

to Trinity (*Id.* at 37), which amount, $825,000, is documented in the Trinity-Northwest Agreement. (PX 1). Both Northwest, the company, and Fox, individually, benefited. The fact that some of the money was used to pay Northwest's creditor does not make the receipt of the money any less of a benefit to Northwest.

In their post-trial proposed order, Defendants contend, without citing any authority, that "[a]bsent an underlying breach of contract, there was also no unjust enrichment enjoyed by Defendants, because the withdrawal of the Plaintiffs' applications before the FCC, did not guaranty [*sic*] that [Northwest] would necessarily be awarded anything." (Dkt. 120 at p. 10). But no "underlying breach of contract" is required for Plaintiffs to prevail on their unjust enrichment claim. Unjust enrichment is considered to be an independent cause of action. *See Raintree Homes, Inc. v. Vill. of Long Grove*, 209 Ill. 2d 248, 258, 282 Ill. Dec. 815, 821 (2004); *Am. Inter-Fid. Corp. v. M.L. Sullivan Ins. Agency, Inc.*, No. 15 C 4545, 2017 U.S. Dist. LEXIS 89211, at *10 (N.D. Ill. June 9, 2017) (citing *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011)). It "is a theory of liability under which the law imposes an obligation upon the defendant to repay a benefit that it obtained at the plaintiff's expense, even in situations where the defendant does not owe a contractual duty to repay and has not committed an independent tort directed at the plaintiff." *Am. Inter-Fid. Corp.*, 2017 U.S. Dist. LEXIS 89211, at *11 (N.D. Ill. June 9, 2017) (internal quotations and citations omitted); *Blue Sky Fairfield, LLC v. Leaven*, 2017 IL App (1st) 143938-U, ¶ 20 ("The theory of unjust enrichment is an equitable remedy based upon a contract implied in law and the basis for the unjust

enrichment doctrine is that no one ought to enrich himself unjustly at the expense of another.") (internal quotations and citations omitted); *Nesby v. Country Mut. Ins. Co.*, 346 Ill. App. 3d 564, 566, 281 Ill. Dec. 873, 875 (2004). While it may be true that Plaintiffs' actions did not "guarantee" that Northwest would benefit, Northwest *did* benefit. Fox admitted as much at trial.

The Court agrees with Plaintiffs that both Northwest and Fox benefited and should be held liable for unjust enrichment. Plaintiffs seek the value of the benefit conveyed by G67, $600,000, and the value of the benefit conveyed by DM, $450,000. (Dkt. 119 at p. 11). However, the benefit received by Northwest was $1,025,000.00 (PX 1) and the benefit received by Fox was $100,000.00. (Tr. at 38). *See Cleary*, 656 F.3d at 520 (unjust enrichment is "a means of recovering something that the defendant is not entitled to but is unfairly possessing to the plaintiff's detriment.") and *Reinbold v. Kohansieh (In re Sandburg Mall Realty Mgmt. LLC)*, 563 B.R. 875, 891 (Bankr. C.D. Ill. 2017) ("Since unjust enrichment is premised on a contract implied by law, the measure of damages focuses on the benefit received and retained by the defendant."). Therefore judgment on Count III against Northwest is $1,025,000.00 and against Fox is $100,000.00.

G67 and DM also seek reasonable attorneys' fees, costs and pre-judgment and post-judgment interest. (Dkt. 119 at p. 11). Plaintiffs cite no authority to support their claim for attorneys' fees or pre-judgment interest. *See In re Sheridan,* 105 F.3d 1164, 1166 (7th Cir. 1997) ("under the 'American Rule'…a prevailing litigant may not collect a reasonable attorney's fee from his opponent unless authorized by

federal statute or an enforceable contract between the parties."); *Smith v. Navistar Int'l Transp. Corp.*, 744 F. Supp. 832, 834 (N.D. Ill. 1990) ("Generally, Illinois law requires pre-judgment interest only when provided by statute or by agreement of the parties."). Post-judgment interest is permitted, however, under 28 U.S.C. § 1961. Plaintiffs may also file a motion for reasonable costs pursuant to Federal Rule of Civil Procedure 54(d)(1).

Defendants oppose any liability because: "The transactions memorialized by the two Contracts . . . were never consummated, and therefore, no monies are due by Defendants to either Plaintiff entity." (Am. Compl. at p. 8; Dkt. 109 at p. 12). Fox's testimony at trial clarified, somewhat, the meaning of this affirmative defense—that certain "material adverse changes" occurred, most importantly that the license issued by the FCC was for Channel 8. Fox testified that "[t]he channel position from 67 to 53 to 8 decimated us in terms of value." (Tr. at 47). Defendants argue that because of the "material adverse changes," they had no obligation to pay Plaintiffs.[6]

The Court does not find this defense persuasive in defeating an unjust enrichment claim. Regardless of whether the transaction originally contemplated by the parties would have been more lucrative, Defendants still received a benefit to

---

[6] Fox's testimony at trial showed the he believed the most important "material adverse change" was the change to Channel 8, in addition to some others, but not the fact that the Second Generation did not loan Northwest money under the Second Generation Agreement. (Tr. at 18-19, 47-48). Defendants' post-trial brief states that the Second Generation Agreement was never performed. (Dkt. 120, ¶10). To the extent Defendants believe this was another "material adverse change" and a defense to unjust enrichment, the trial testimony did not support it, and moreover this argument is waived. *See Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 349 (7th Cir. 2009) (underdeveloped arguments are considered waived).

Plaintiffs' detriment, as Fox admitted at trial. Defendants' receipt of the benefit violates the fundamental principles of justice, equity, and good conscience.

## C. Fraudulent Transfer against Northwest and Fox

Plaintiffs claim that Defendants are liable for fraudulent transfer under Illinois' Uniform Fraudulent Transfer Act (the "Act"), 740 ILCS 160/5(a), which requires proof of actual intent to defraud: "(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor." Actual intent must be proven by clear and convincing evidence. *Wachovia Sec., LLC*, 674 F.3d at 757; *see also Firstar Bank, N.A. v. Faul Chevrolet, Inc.*, 249 F. Supp. 2d 1029, 1047 (N.D. Ill. 2003) ("a creditor must show that the debtor entered into the transaction with a specific intent to defraud creditors."). Without direct evidence of actual fraud, courts evaluate the evidence in light of the "badges of fraud" listed in 740 ILCS 160/5(b).

The Court concludes that Plaintiffs did not prove by clear and convincing evidence that the transfer in this case was done with actual intent to hinder, delay, or defraud Plaintiffs. The Court addresses two initial matters before turning to the "badges of fraud."

### 1. The Fraudulent Transfer

The Court initially addresses the "transfer" Plaintiffs claim was fraudulent. At trial, the evidence showed that Trinity paid Northwest $1,125,000—$825,000 of

which canceled a loan Northwest owed to Trinity, $100,000 went to Fox, $100,000 to the two other shareholders, and the rest to attorneys and brokers. Plaintiffs alleged that the "distribution from Northwest to Fox constitutes a fraudulent conveyance." (Am. Compl., ¶18). Plaintiffs' pre-trial order stated that Northwest "sold the license for $1,200,000.00 and allegedly transferred the funds to third parties/shareholders of Northwest, including Defendant Fox (the fraudulent transfer)" and that Defendants "were well aware of the rights of Plaintiffs as creditors when they distributed the $1,200,000.00 sale proceeds of the Broadcast License." (Dkt. 109 at pp. 6-7).[7] Plaintiffs' post-trial filing states that Northwest was aware of its obligations to DM and G67 when it "disbursed the entirety of the proceeds from the sale of the station" and the "disbursement of the $1,125,000.00 in proceeds from the sale of the Station to Trinity was done at the direction of its President." (Dkt. 119, ¶¶45-46).

Therefore, the Amended Complaint's narrower focus on the distribution to Fox only was expanded to encompass Defendants' distribution of the entire proceeds earned from the Trinity-Northwest Agreement ($1,125,000.00). To the extent the broader definition of the alleged fraudulent transfer conflicts with allegations in the Amended Complaint, the Court adopts the broader definition described in the pre-trial order. *See DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 628 (7th Cir. 2013) ("the pretrial order is treated as superseding the pleadings and

---

[7] Plaintiffs' reference to $1,200,000.00 was an error. The evidence at trial showed the amount Trinity paid Northwest was $1,125,000.00.

establishes the issues to be considered at trial.") (internal citations and quotations omitted).

### 2. Defendants' Argument Regarding Breach of Contract

Without citation to authority, Defendants argue that "absent an underlying breach of contract, there can have been no fraudulent conveyance." (Dkt. 120 at p. 8, ¶7). They argue that there was no evidence at trial that Northwest was aware or should have been aware of a financial obligation to Plaintiffs, and no such obligation existed at the time the alleged fraudulent transfer occurred. (*Id*. at ¶10).

The Act does not require an underlying breach of contract to establish a fraudulent conveyance. To the contrary, the Illinois Supreme Court has held that under the Act, a creditor must show that the debtor "owes or potentially owes a 'payment' to the creditor." *A.P. Props. v. Goshinsky*, 186 Ill. 2d 524, 529, 239 Ill. Dec. 600, 603 (1999). The Act broadly defines "claim" as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 740 ILCS 160/2. *See Heartland Bank & Tr. Co. v. Goers,* 2013 IL App (3d) 120854-U, ¶ 31 ("[Illinois] [c]ourts treat the term 'claim' broadly.") and *Nostalgia Network v. Lockwood*, No. 00 C 2418, 2001 U.S. Dist. LEXIS 544, at *17 (N.D. Ill. Jan. 23, 2001) (noting that a "claim" under the Act may exist before the filing of a lawsuit). The Act also applies to a transfer "whether the creditor's claim arose before or after the transfer was made or the obligation was incurred." 740 ILCS 160/5(a). Thus to

show they had a "claim" against Defendants, Plaintiffs were only required to prove, and they did, that Defendants potentially owed them a payment.

### 3. Badges of Fraud

Plaintiffs did not present any direct evidence of actual fraud at trial. The Court therefore looks to the "badges of fraud" listed in 740 ILCS 160/5(b) "to see whether a sufficient number gave rise to an inference or presumption of fraud." *Wachovia Sec., LLC*, 674 F.3d at 758; *see also Frank IX & Sons v. Phillipp Indus.*, 95 C 3195, 1997 U.S. Dist. LEXIS 12889, at *19 (N.D. Ill. Aug. 22, 1997) (noting that the list of "badges of fraud" is "not all-inclusive, and the court may also consider other evidence."). Plaintiffs allege the following five of the eleven "badges of fraud" are present in this case:

> "(1) the transfer or obligation was to an insider;...(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets...(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred...(10) the transfer occurred shortly before or shortly after a substantial debt was incurred. 740 ILCS 160/5(b).

### a. Transfer to an insider (740 ILCS 160/5(b)(1))

Northwest transferred $100,000 to Fox, the President of Northwest. There is no dispute that Fox was an "insider" as the term is used in the Act. 740 ILCS 160/2(g)(2) (an insider includes a director, officer, or person in control of the corporation). Therefore this "badge of fraud" was present.

Nevertheless, the Court notes that most of the $1,125,000 was used to pay a loan owed to Trinity. Under Illinois law, "the mere preference of one or more

creditors over others does not constitute a fraudulent transfer....A debtor may prefer one creditor to another provided such preference is made in good faith with the intent to pay or secure the payment of a just indebtedness against him." *Schacht v. Katten Muchin & Zavis (in re MedCare HMO)*, 294 Ill. App. 3d 42, 52, 228 Ill. Dec. 502, 509 (1st Dist. 1997); *see also Firstar Bank, N.A.*, 249 F. Supp. 2d at 1048 (because defendants used the sale of assets to pay a debt owed to a secured creditor, it appeared defendants' intent was "to best pay its creditors, not to delay payment" or defraud creditors). While the Court finds that this "badge of fraud" existed because of Fox's status as an "insider," the fact that the majority of the money was used to pay other creditors or potential creditors is evidence weighing against a finding that Defendants acted with fraudulent intent.

### b. Debtor had been sued or threatened with suit before the transfer (740 ILCS 160/5(b)(4))

There was no evidence at trial that Defendants had been sued or even threatened with suit before the transfer. Although the Amended Complaint alleged the existence of a "demand letter," Plaintiffs provided no evidence of any demand letter at trial. Plaintiffs argue that "Northwest and Fox well knew or should have known that this claim asserted in the instant lawsuit was imminent." (Dkt. 119 at 13). But that is not the standard in the statute. The statute requires that the debtor "had been sued or threatened with suit." 740 ILCS 160/5(b).

### c. The transfer was of substantially all the debtor's assets (740 ILCS 160/5(b)(5))

There was evidence at trial that the transfer was of substantially all of Northwest's assets. Fox testified at trial that after Northwest's distribution of the $1,125,000, Northwest had only about $1,000 in the bank and no other assets. (Tr. at 42-43).

### d. The debtor became insolvent shortly after the transfer was made (740 ILCS 160/5(b)(9))

The evidence at trial showed that Northwest became insolvent shortly after the transfer was made. Plaintiffs' counsel asked Fox whether Northwest was "left insolvent" after the money from Trinity was disbursed. (Tr. at 42-43). Fox responded: "Well, we had a thousand dollars in the bank or whatever it was, yeah." (*Id.* at p. 43).

### e. The transfer occurred shortly before or shortly after a substantial debt was incurred (740 ILCS 160/5(b)(10))

Plaintiffs did not prove that the transfer occurred shortly before or after "a substantial debt was incurred." Although Plaintiffs had a potential "claim" against Defendants at the time of the transfer, they did not prove that Defendants incurred a substantial debt around that time. Courts have found that substantial debts were incurred where a judgment has been entered against the debtor or there was evidence of an outstanding debt. *See Bay State Milling Co. v. Martin,* 99 C 6796, 2001 U.S. Dist. LEXIS 3402, at *8 (N.D. Ill. Mar. 14, 2001) (transfer occurred before defendants incurred a substantial debt—a judgment entered by the district court); *Lincoln Nat'l Life Ins. Co. v. Nicklau, Inc.*, No. 98 C 2453, 2000 U.S. Dist. LEXIS

6936, at *18 (N.D. Ill. May 17, 2000) (transfer occurred shortly before a substantial debt resulting from a state court judgment was incurred); *Berland*, 215 B.R. 158, 169 (Bankr. N.D. Ill. 1997) (substantial debt incurred when debtor incurred over $84,000 in debt to medical care providers). Here, there was no evidence of an existing debt or any judgment entered against Defendants. Allegations that the parties had a contract and that contract was breached around the time of the alleged fraudulent transfer is not enough to prove this badge of fraud.

All told, Plaintiffs proved the existence of only three of the eleven badges of fraud. Without evidence of any other circumstances to support a finding of actual fraud, the Court finds that Plaintiffs did not meet their burden to prove by clear and convincing evidence that Defendants acted with fraudulent intent when they disbursed the proceeds from the sale of the license. *Cf. Wachovia Sec., LLC*, 674 F.3d at 758 (affirming district court's finding of actual fraud because proof of five badges of fraud in addition to attendant circumstances supported inference of defendant's fraudulent intent); *A.G. Cullen Constr., Inc. v. Burnham Partners*, LLC, 2015 IL App (1st) 122538, ¶ 39, 390 Ill. Dec. 647, 658, 29 N.E.3d 579, 590 (nine badges of fraud weighed in favor of presumption of fraud); *Firstar Bank, N.A.*, 249 F. Supp. 2d at 1048 (four badges of fraud not sufficient to prove that defendants acted with specific intent to defraud creditors). Defendants are entitled to judgment on the fraudulent transfer claim.

# VI. CONCLUSION

The Court enters FINAL JUDGMENT in favor of Plaintiffs Galesburg 67, LLC and DM Partners and against Defendants Northwest Television, Inc. and Bruce Fox, on Plaintiffs' claim of unjust enrichment. The Court enters final judgment in Defendants' favor on Plaintiffs' breach of contract and fraudulent transfer claims.

Defendant Northwest is liable in the amount of $1,025,000.00 and Defendant Fox is liable in the amount of $100,000.00. Northwest is liable to Plaintiff Galesburg 67, LLC in the amount of $585,714.29 and to Plaintiff DM Partners in the amount of $439,285.71. Fox is liable to Galesburg 67, LLC in the amount of $57,142.86 and to DM Partners in the amount of $42,857.14. Within thirty (30) days of this order, Plaintiffs may file a motion seeking reasonable costs pursuant to Federal Rule of Civil Procedure 54(d)(1).

Dated: August 22, 2017          E N T E R:

MARY M. ROWLAND
United States Magistrate Judge